UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

_____

| | |
|---|---|
| In Re:<br>Robert B. Quilling and<br>Janey L. Quilling,<br><br>         Debtors. | Bankruptcy Case<br>No. 11-41337-JDP |

_____

| | |
|---|---|
| R. Sam Hopkins,<br>Chapter 7 Trustee,<br><br>         Plaintiff,<br>vs.<br><br>Robert B. Quilling and<br>Janey L. Quilling,<br><br>         Defendants. | Adv. Proceeding<br>No.14-8018-JDP |

_____

**MEMORANDUM OF DECISION**
_____

**Appearances:**

James A. Spinner, Service & Spinner, Pocatello, Idaho, Attorney for
Plaintiff.

MEMORANDUM OF DECISION – 1

Amy J. Kingston, Kingston Legal Services, PLLC, Idaho Falls, Idaho,
Attorney for Defendants.

### *Introduction*

Chapter 7[1] trustee R. Sam Hopkins ("Trustee") commenced this

adversary proceeding against debtors Robert B. Quilling and Janey L.

Quilling (the "Quillings") seeking an order compelling them to turn over

funds he contends are bankruptcy estate property, and seeking revocation

of the Quillings' discharge for their failure to have previously done so.

Dkt. No. 1.  In lieu of a trial, the parties submitted this dispute for decision

by the Court based upon their stipulation reciting the facts, relevant

documentary exhibits, and briefing.  Dkt. Nos. 36, 37.  The Court

conducted a hearing on September 23, 2014, to consider the parties' oral

arguments.  Having taken the issues under advisement, and having

carefully reviewed the record and submissions, this Memorandum of

Decision sets forth the Court's findings of fact, conclusions of law, and

---

[1]  Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all Rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

MEMORANDUM OF DECISION – 2

decision.  Rule 7052.

*Stipulated Facts*[2]

The Quillings filed a chapter 7 petition on August 11, 2011; Trustee
is the trustee in that bankruptcy case.

At all relevant times, Mr. Quilling was the sole owner of the stock in
Regal Investments of Idaho, Inc. ("Regal Investments"), an Idaho
subchapter S corporation.  Regal Investments of Idaho, LLC ("the LLC"),
the Quillings' prior business entity, was merged into Regal Investments on
October 18, 2010.  The LLC filed its final tax return in early 2011, for the
2010 tax year.  Regal Investments filed its first tax return for tax year 2010
in early 2011.

The LCC had enrolled as a "Marketing Executive" with Freelife
International, Inc. ("Freelife") in January, 2009.  Freelife is a multi-level
marketing program that recruits Marketing Executives to engage in direct
sales of Freelife's health food products, programs, and supplements.  The

---

[2] With only minor edits, these facts are the same as recited by the parties.
*See Stipulation*, Dkt. No. 37.

MEMORANDUM OF DECISION – 3

Freelife business model anticipates its Marketing Executives will recruit a team of their own "downstream" Marketing Executives.

Freelife does not dictate how its Marketing Executives participate; they may do so as individuals, or as business entities. To enroll, a Marketing Executive must pay $29.95 to Freelife. Once enrolled, a Marketing Executive earns commissions on all sales made either directly by the Marketing Executive to customers, or by any of the downstream Marketing Executives they or their team have recruited. The amount of commissions is determined using a points system. Each Freelife product is assigned a point value, and a Marketing Executive earns the points assigned to it by directly selling the product, or a percentage of the points for sales by downstream Marketing Executives. In addition, in various ways, Marketing Executives may also earn bonuses from Freelife based upon the volume of their sales and the sales of their downstream Marketing Executives. If a Marketing Executive is unable or unwilling to sell sufficient Freelife product, or to recruit other Marketing Executives to earn at least one hundred points in product sales (amounting to about

MEMORANDUM OF DECISION – 4

$150) in two consecutive months, the Marketing Executive loses its

downstream marketing team, and thereby, loses its income from Freelife.

If there is no sales activity for six months, a Marketing Executive is

removed from Freelife's system.

The Quillings established Regal Investments to receive the income

generated from their own Freelife sales, the sales of their downstream

Marketing Executives, and any bonuses.  Regal Investments succeeded to

LLC's rights as a Marketing Executive with Freelife, received all payments

from Freelife, and Regal Investments would then make payments to the

Quillings.

The Quillings hired a CPA to prepare personal and corporate tax

returns for 2011, 2012, and 2013.   Since 2011, all of the Quillings' personal

income has all come from distributions made to them by Regal

Investments, for wages, director payments, shareholder distributions, and

as reimbursement of expenses.  In turn, all of the payments made to the

Quillings, regardless of how designated in the tax returns, were funded

via the checks Regal Investments received monthly from Freelife.

MEMORANDUM OF DECISION – 5

From August 2011 to September 2013, Regal Investments received

$379,278.53 from Freelife.  Most of this income was generated through the

commissions earned for the sales made by Regal Investment downstream

Marketing Executives  (who, in turn, generated sales through their own

downstream Marketing Executive teams).  Indeed, the Quillings estimate

that there are approximately 1000 persons operating downstream from

them.

According to the Quillings' individual tax returns, in 2011, Mr.

Quilling received $45,000 as a director's fee from Regal Investments, on

which self employment taxes were paid.  In addition, in 2011, the Quillings

received distribution income from Regal Investments as identified on a

Form K-1 in the amount of $42,788.  According to the corporate tax

returns, additional amounts in the same year, totaling approximately

$53,307, were deducted from the gross business income of Regal

Investments to cover the business and personal expenses of the Quillings,

including their medical insurance premiums.

MEMORANDUM OF DECISION – 6

For 2012, the tax returns reported that Quillings were paid a $45,000 director's fee from Regal Investments, along with Form K-1 distributions of $68,763, and that additional amounts were paid by Regal Investments totaling about $61,306 for Quillings' business and personal expenses, including their medical insurance premiums.

For 2013, the tax returns changed the manner is which the funds paid by Regal Investments to Quillings were reported.  No director's fees from Regal Investments were reported; instead, the Quillings reported that Mr. Quilling received $36,000 in wages from Regal Investments, as evidenced by a Form W-2 attached to the return, on which employment taxes were paid.  The Form K-1 attached to the Quillings return reported distributions from Regal Investments of $58,606, and other income from Regal Investments of $6,250.  Approximately $45,000 was deducted from the gross business income of Regal Investments to cover business and personal expenses, however, no health insurance premiums were reported.

MEMORANDUM OF DECISION – 7

In addition to these transactions, its tax returns disclosed that Regal Investments took depreciation deductions in 2012 and 2013 for a 2008 Cadillac Escalade owned by the Quillings.  Regal Investments also received a monthly payment from Freelife toward the purchase of the vehicle.  A projector, computers, and Macbooks were depreciated by Regal Investments in 2011.

Again, as explained above, for the relevant periods, the Regal Investment distributions were the Quillings' only source of income after they filed for bankruptcy, and Regal Investments derived its income solely from the payments it received from Freelife.[3]

---

[3]  In addition to these stipulated facts, the parties submitted a variety of documentary exhibits to the Court for its consideration, including: (1) Exhibits "1 through 9 submitted by [the Quillings] in support of their motion for summary judgment," which is Dkt. Nos. 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22 on the Court's docket; (2) "Exhibits 1 and 2 submitted with [the Quillings'] reply pleading," which are Dkt. Nos. 35-1 and 35-2; and (3) Trustee's "Exhibits A through D submitted by [Trustee] in response to [the] motion for summary judgment," Dkt. No. 32 at 4-20.  *See Stipulation*, Dkt. No. 37 at 5.  The parties further agreed that "the Court can consider and take notice of the schedules and amended schedules filed in the Quillings' bankruptcy proceeding."  *Id.*
    Notably absent, however, from the stipulated exhibits are the affidavits of the Quillings that were previously submitted in connection with the summary judgment motion in this adversary proceeding in which affidavits the Quillings

MEMORANDUM OF DECISION – 8

*Analysis and Disposition*

While Trustee initially sought turnover of more of the Quillings'

receipts from Regal Investments, Trustee now targets only amounts

designated in the Quillings' tax returns as shareholder distributions to Mr.

Quilling paid in 2011, 2012, and 2013, in the amount of $170,157.00.

Trustee argues that these amounts, all received after the Quillings filed

their bankruptcy petition, were property of the estate per § 541(a).

Moreover, Trustee argues that these payments did not represent "earnings

from services performed" by the Quillings for purposes of the estate

exclusion in § 541(a)(6).  To support this contention, Trustee points out that

the Quillings were indeed paid wages by Regal Investments for 2011, 2012,

and 2013, which he does not seek to have turned over.  He contrasts those

wages payments with the shareholder profits distributed to the Quillings,

---

describe, in some detail, their personal efforts in generating the income from
Freelife, through Regal Investments.  *See, e.g.*, Dkt. Nos. 23 and 35-5.  The only
stipulated exhibit submitted by the parties that references the nature and extent
of the services preformed by the Quillings is the partial transcript of a Rule 2004
Examination of the Quillings, discussed in more detail below.  *See* Dkt. No. 22
and Dkt. No. 32 at 4-6.

MEMORANDUM OF DECISION – 9

as reported on the Quillings' tax returns, for those time periods.  Trustee

argues that most of the income the Quillings received, as represented in

the K-1's filed with their corporate and personal returns, was not derived

from the Quillings' personal services, but was instead generated solely

from the sales made by the downstream Marketing Executives on their

team, and as such, took the form of "residual payments and related

bonuses" under the Freelife program.  Dkt. No. 34 at 10.

Finally, Trustee argues that the Quillings' failure to turn over the

payments they received after bankruptcy constitutes grounds to revoke

their discharge.  However, at the hearing, Trustee conceded that, due to

the unsettled legal status of the payments, the stipulated facts were likely

not adequate to establish that the Quillings' discharge should be revoked

under § 727(d).[4]

---

[4] The Court agrees that Trustee's § 727(d) claim fails on this record.  The
only possible basis to support Trustee's claim is § 727(d)(2), which allows a court
to revoke a discharge if the debtor acquired property of the estate but knowingly
and fraudulently failed to turn the property over to the trustee.  Here, the
stipulated facts and exhibits do not show that the Quillings acted with the
requisite fraudulent intent in failing to deliver the money to Trustee, even if the

The Quillings counter Trustee's claims by arguing that, regardless of the label given to the distributions in their tax returns, all of the money paid to them by Freelife via Regal Investments was generated due to their personal services, and therefore, would be excluded from the bankruptcy estate under § 541(a)(6). As evidence, the Quillings point to the efforts they invested in their full-time Freelife business, not only to directly sell products to customers, but through training sessions, support services, other contacts and meetings with their Marketing Executives to help them generate these profits.[5]

## I. Turnover of Property of the Estate

### A. Applicable Law

---

funds they received belonged to the estate.

[5] Apparently as a fallback position, the Quillings note in their briefing that some of the payments in question are attributable to sales made prior to their bankruptcy petition filing, even though they were received postpetition, and that on September 16, 2014, they filed an amended schedule C to claim the bulk of those payments from Regal Investments exempt under Idaho Code § 11-207(1). Bankr. No. 11-41337 at Dkt. No. 100. Trustee has objected to the amended claim of exemption. *Id*. at Dkt. No. 103. Of course, resolution of that issue is premature, and the Court declines to consider it at this time.

MEMORANDUM OF DECISION – 11

When a bankruptcy petition is filed all "legal or equitable interests of the debtor in property as of the commencement of the case" are included in the resulting bankruptcy estate.  § 541(a); *Hopkins v. McCallister (In re Bar GW Ranch and Trucking, LLC)*, 2014 WL 5363807, at *2 (Bankr. D. Idaho Oct. 21, 2014).  As relevant here, "[a] number of Idaho cases hold that a debtor's interest in a separate legal entity becomes property of the estate even if the other entity's assets do not.  *See, e.g., In re Hale*, 04.3 IBCR 128, 129 (Bankr. D. Idaho) (addressing partner's interest in limited partnership); *Hopkins v. Brossard (In re Neuroscience Ctr., P.C.)*, 04.1 IBCR 45, 47 (Bankr. D. Idaho 2004) (addressing interest in subchapter S corporation); *In re Brown*, 00.3 IBCR 123, 123-24 (Bankr. D. Idaho 2000) (addressing interest in a subchapter S corporation); *In re Fisher*, 94 IBCR 130, 131 (Bankr. D. Idaho 1994) (addressing limited partnerships)."  *In re A-Z Elecs., LLC*, 350 B.R. 886, 890 n.11 (Bankr. D. Idaho 2006).  The debtor's interest in a separate entity that becomes part of the bankruptcy estate includes "both economic and management rights" of the entity held by the

debtor.  *Gugino v. Nelmap, LLC (In re Wallace)*, 2013 WL 1681780, at *3

(Bankr. D. Idaho April 17, 2013) (citing *Fursman v. Ulrich (In re First Prot.,*

*Inc.)*, 440 B.R. 821 (9th Cir. BAP 2010)).

Property of the estate also includes the "[p]roceeds, product,

offspring, rents, or profits of or from property of the estate, except such as

are earnings from services performed by an individual debtor after the

commencement of the case."  § 541(a)(6).  The exception in § 541(a)(6)

"excepts from the proceeds of the estate only those earnings generated by

services personally performed by the individual debtor."  *FitzSimmons v.*

*Walsh (In re FitzSimmons)*, 725 F.2d 1208, 1211 (9th Cir. 1984).  However,

§ 541(a)(6) "speaks only of 'services performed by an *individual* debtor,' . . .

reinforcing [the above] conclusion that it excepts only earnings from

services personally performed by an individual debtor, since the services

of a debtor's employee or return on capital are not services of the

individual debtor himself."  *Id.* (emphasis in original).  "When

determining 'earnings' for § 541(a)(6) purposes . . . the focus should be 'on

MEMORANDUM OF DECISION – 13

the manner by which the amount owed the debtor was generated, rather than the words used to characterize that obligation.'" *In re Atkinson*, 258 B.R. 769, 774 (Bankr. D. Idaho 2001) (quoting *In re DeBoer*, 99 IBCR 101, 104 (Bankr. D. Idaho 1999)).

Here, as the representative of the bankruptcy estate, Trustee invokes § 542(a) to recover the payments made to the Quillings, which provides that:

> an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

*See also Collect Access, LLC v. Hernandez (In re Hernandez)*, 483 B.R. 713, 720 (9th Cir. BAP 2012) (instructing that "[a] bankruptcy court may order turnover of property to the debtor's estate if, among other things, such property is considered 'property of the estate.'").   The trustee has the burden of proving the estate is entitled to turnover of property.  *Wolfe v.*

MEMORANDUM OF DECISION – 14

*Jacobson (In re Jacobson)*, 676 F.3d 1193, 1200-01 (9th Cir. 2012) (citing 5

COLLIER ON BANKRUPTCY ¶ 542.02 (16th ed. 2011)).[6]  However, the "debtor

has [the] burden of proving payments received postpetition should be

excluded from property of the estate under § 541(a)."  *In re Lemos*, 243 B.R.

96, 98 (Bankr. D. Idaho 1999) (citing *Johnson v. Taxel (In re Johnson)*, 178 B.R.

216, 220-21 (9th Cir. BAP 1995)); *see also In re Evans*, 464 B.R. 429, 438

(Bankr. D. Co. 2011).

### B.  Application of Law to Facts

 The Court concludes that Trustee has demonstrated by a

preponderance of the evidence that all payments to the Quillings made by

Regal Investments noted on the K-1 forms in the tax returns for 2011, 2012,

and 2013, are property of the bankruptcy estate.  Because it is undisputed

---

[6] As noted in *In re Jacobson*, 676 F.3d at 1201, the Ninth Circuit has not decided the quantum of proof required of a trustee under this section.  However, this Court has determined that, in order to secure an order for turnover, a trustee must prove that the target is property of the estate by a preponderance of the evidence.  *See In re Neuroscience Ctr., P.C.*, 04.1 IBCR at 48 (applying the preponderance of evidence standard to an action for turnover of property of the estate); *accord* 5 COLLIER ON BANKRUPTCY ¶ 542.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

MEMORANDUM OF DECISION – 15

that Mr. Quillings owned all of the stock in Regal Investments when the Quillings filed their bankruptcy petition, his equity in that company became estate property. As a result, any distributions thereafter made to the Quillings as shareholder profits constituted proceeds or profits of Mr. Quillings' equity, and accordingly, those distributions were estate property, too, for purposes of § 541(a)(6).

On the other hand, the Court concludes that the Quillings failed to prove that the earnings exception in § 541(a)(6) excludes the shareholder distributions made to them by Regal Investments from the bankruptcy estate. Indeed, on this record, it is simply unclear how the shareholder payments were derived from their personal services, as opposed to the services performed by others.

More particularly, here, upon commencement of the Quillings' bankruptcy case, an estate was created that included Mr. Quillings' shareholder ownership interest in Regal Investments. *See* § 541(a); *In re A-Z Elecs., LLC*, 350 B.R. at 890 n.11. After the bankruptcy case was filed,

MEMORANDUM OF DECISION – 16

Regal Investments made payments to the Quillings designated as

shareholder distributions in the sworn tax returns.  *See*  Stipulated Exhibits

Dkt. No. 12 at 7, 2011 ($42,788); Dkt. No. 15 at 6, 2012 ($68,763); and Dkt.

No. 16 at 7, 2013 ($58,606).  According to the returns, these post-

bankruptcy distributions were in addition to the wages and compensation

paid by Regal Investments to the Quillings during 2011, 2012, and 2013.

Effectively, by their own admissions, through the Quillings' tax returns,

Trustee has proven that these shareholder distributions were property of

the bankruptcy estate.  Because these payments to the Quillings were on

account of Mr. Quillings' shareholder status, they represented proceeds or

profits from his equity interest in the corporation, which was itself

property of the estate.

Quillings' argument that the earnings exception under § 541(a)(6)

excludes these distributions from the bankruptcy estate lacks merit on this

record.  The Quillings argue that every dollar they received from Regal

Investments, including the distributions identified in the K-1 forms, was

MEMORANDUM OF DECISION – 17

paid to them was on account, directly or otherwise, of the personal

services they rendered to support of the company's activities.  As a result,

they contend, all such payments were "earnings from services performed

by an individual debtor after the commencement of [their] case" for

purposes of § 541(a)(6) and excluded from property of the estate.

Unfortunately, while the Quillings' arguments sounds good enough

in the abstract, the actual proof submitted to the Court concerning what

services the Quillings personally performed, as opposed to the services

performed by others, is lacking.  The stipulated facts and evidence simply

do not demonstrate the kind or amount of personal services the Quillings

performed to "earn" the shareholder distributions.  The stipulated

documentary exhibits also provide little insight into what the Quillings

personally did to generate these corporate profits.  On the other hand, the

stipulated facts make clear that the Quillings maintained an extensive

team of Marketing Executives, who after they were recruited, generated

the sales to customers which, at least by implication, generated the bulk of

MEMORANDUM OF DECISION – 18

the money paid to Regal Investments by Freelife.   While the Quillings

apparently worked hard to make their company successful, and supported

their "team", the money distributed to them by Regal Investments is

attributable to sales by their Marketing Executives.  While the Quillings'

efforts may have helped the Marketing Executives make sales, the

evidence is equivocal concerning whose efforts were primarily responsible

for those sales and the corresponding commissions paid by Freelife to

Regal Investments, and then distributed to the Quillings. Because the

parties elected to submit the issues to the Court for decision based upon

the limited, stipulated record in lieu of a trial, they are accountable for the

impact of those limitations in proving their cases.  *See, e.g., Hopkins v.*

*Suntrust Mortg., Inc. (In re Ellis)*, 441 B.R. 656, 666 (Bankr. D. Idaho 2010)

(determining a party who bore the burden of proof failed to carry that

burden in a case submitted to the Court for a decision on stipulated facts).

Here, the record submitted by the Quillings is inadequate to satisfy their

burden of proving that the payments were excluded from the bankruptcy

MEMORANDUM OF DECISION – 19

estate.

The only documentary evidence before the Court at all illuminating the personal efforts rendered by the Quillings in their business is the partial transcript of their Rule 2004 examination.  Dkt. No. 22.[7]  However, in that examination, the Quillings only vaguely reference the work they did generally to generate the payments from Freelife, without specific references to their efforts to earn the money at issue:

> [Counsel for Trustee ("Counsel")]: . . . You talked to me a little bit about Freelife . . . can you tell me how that's set up, how it operates?
>
> Mr. Quilling: Yeah.  It's – we sell diet product, and helps people lose weight, and, you know, we build basically leadership with it in the group, and as there is product sold, we receive a commission on that.
>
> [Counsel]: Okay.  So, what did you say you were? You're not distributors . . . .
>
> Mr. Quilling: Marketing executives.

---

[7]  The same incomplete Rule 2004 examination transcript was also submitted by Trustee, Dkt. No. 32 at 4-6.

MEMORANDUM OF DECISION – 20

[Counsel]: Marketing executives.

Mr Quilling: Uh-huh.

[Counsel]: So what are your duties?

Mr. Quilling: Basically, our role is to help educate people about the product, make sure they're taking it right, put on events. We do events, you know, where people come and learn about the product.

Mrs. Quilling: Trainings [sic].

Mr. Quilling: Trainings [sic]. That's primarily our purpose.

[Counsel]: Okay. Is it pretty involved?

Mrs. Quilling: Yeah.

Mr. Quilling: It is. Yeah, we spend a lot of time at it.

[Counsel]: You do?

Mr. Quilling: Uh-huh.

[Counsel]: About how many hours a week?

Mr. Quilling: More than full time.

MEMORANDUM OF DECISION – 21

[Counsel]: Is it?

Mr. Quilling: Both of us.

[Counsel]: I wondered about that.

Mrs. Quilling: We do travel.

Mr. Quilling: Yeah.  We do a lot of traveling.

[Counsel]: Throughout the country?

Mrs. Quilling: Uh-huh.

[Counsel]: So as a marketing executive, you set up a downline; is that correct?

Mr. Quilling: Yeah.

* * *

Mrs. Quilling: The hard thing about [the turnover of the money to the trustee] is if we don't go out and work sixty, eighty hours a week, both of us, and spend time away from our kids, we don't make anything.

This cryptic exchange is insufficient to establish the Quillings' personal

services that generated the profits paid to them by Regal Investments as

MEMORANDUM OF DECISION – 22

identified in the K-1 forms, or whether those payments resulted, instead, from the services of the Marketing Executives.  *See In re FitzSimmons*, 725 F.2d at 1211.

On this record, the Court concludes that Trustee has proven that the profits of Regal Investments distributed to the Quillings totaling $170,157.00, as shown in the tax returns for 2011 ($42,788), Dkt. No. 12 at 7; 2012 ($68,763), Dkt. No. 15 at 6; and 2013 ($58,606), Dkt. No. 16 at 7, are property of the estate.  The Quillings have not proven that those funds are excluded from property of the estate based upon the earnings for services they performed as required in § 541(a)(6). As a result, under § 542(a), those funds must be turned over to Trustee.

### *Conclusion*

In a separate judgment, the Court will order that the Quillings turn over $170,157 to Trustee as property of the estate.[8]  Because the right to

---

[8]  As noted above, the Court expresses no opinion concerning whether any portion of this amount is exempt earnings.

MEMORANDUM OF DECISION – 23

such relief was not established, Trustee's claim for revocation of the

Quillings' discharge under § 727(d) will be dismissed.

Dated:  December 3, 2014

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 24